No. 10,060.

B. R. FORMAN VS. NEW ORLEANS AND CARROLLTON RAILROAD COMPANY.

Under the Constitution and laws of the State of Louisiana the city of New Orleans is clothed with full and exclusive power to grant franchises for the construction and operation of passenger street railways, by steam or horse power, within her corporate limits, including the right of regulating the rates of fare to be exacted by said corporations for the transportation of passengers.

The city's discretion in regulating such matters is not subject to judicial control or interference, unless arbitrarily or unlawfully exercised.

That feature of the contract between the city and the New Orleans and Carrollton Railroad Company, which exacts from the public a fare of ten cents from Carrollton to Canal street, except from actual residents above Napoleon avenue, who can on certain conditions make the trip for five cents, is not subject to attack as an unreasonable discrimination prohibited by the law governing the obligations of common carriers.

APPEAL from the Civil District Court, Parish of Orleans. *Houston*, J.

*E. H. McCaleb* and *W. F. Mellen* for Plaintiff and Appellant.
*J. M. Bonner* for Defendant and Appellee.

---

The opinion of the Court was delivered by

POCHÉ, J. Plaintiff complains that he was illegally ejected from one of defendant's cars, for which he claims damages in the sum of

$5000, and he prosecutes this appeal from a judgment which rejected his demand.

The following are the salient facts in the case :

The contract under which the defendant obtained its present franchise was framed under the provisions of two ordinances of the City Council of New Orleans, which contained the specifications under which the right of way was to be sold to the company, among which was the following :

" FARE.—The rates of fare from Canal street to the head of Jackson street and the Napoleon avenue station, and points between, shall be (5) five cents, and (5) five cents beyond Napoleon avenue station, between the hours of 4 A. M. and 12:30 P. M., except to actual residents above Napoleon avenue, who shall have the privilege of purchasing through tickets at the rate of ten for fifty cents. The fare between 12:30 P. M. and 4 A. M. to be charged shall be (10) ten cents to Napoleon avenue, and (10) ten cents from there to Carrollton."

In compliance with that stipulation the company procured tickets in bunches of ten each, which it has been selling exclusively, at least knowingly, to actual residents above Napoleon avenue, designed as explained in the opinion of this Court in the case of De Lucas vs. Railroad Company, 38 Ann. 931.

It appears that plaintiff, who does not reside above Napoleon avenue, obtained a bunch of such tickets from a person who was an actual resident above that street and attempted to ride on one of those tickets from the corner of Second and St. Charles streets to Carrollton. At Napoleon avenue, where the change of cars is effected, he tendered for his fare thence to Carrollton one of the coupons of the tickets in question, which was refused by the collector, on the ground, as acknowledged by plaintiff, that he was not a resident above that avenue. Being called upon to pay the regular fare, and persisting in his claim to pay the same by means of the ticket, plaintiff was ejected from the car.

It appears that on two previous occasions plaintiff had tendered similar tickets for his fare at the same point, which had been refused, but that, in order to avoid an unpleasant contestation, the employee of the company had himself paid plaintiff's fare in currency, as required by the rules of the company.

The crucial point in the case is the contested right of the company to make the discrimination, hereinabove described, in favor of actual residents above Napoleon avenue, which is alleged to be unjust, unreasonable and violative of the legal obligations of the defendant

·company as a·common carrier. Hence, the main relief claimed by plaintiff is a decree condemning the defendant to sell to him and other persons, residing below Napoleon avenue, tickets on the same terms and conditions which are extended to actual residents above Napoleon avenue.

It appears, as above stated, that the discrimination complained of ·does not emanate from the railroad company, but that it was imposed on it as a condition of its franchise by the city.

The leading feature of that stipulation is a limit of the maximum rate which the company can exact for fare between the points therein designated.    Under its requirement the company cannot obtain a ·higher rate·than ten cents between Canal street and Carrollton, or five cents between Carrollton and Napoleon avenue, and between Canal street and Napoleon avenue, or the foot of Jackson street, and intervening points.·

It is shown that during the existence of a previous corporation, which operated a road on the same street between Carrollton and "Lee Circle," several blocks above Canal street, the rate of fare was twenty-five cents each way.

Hence the complaint is not that the rate which is charged to plaintiff and to the public in general is excessive or unreasonable, but the contention is that plaintiff and all persons who do not reside in this city above Napoleon avenue are placed at a disadvantage in comparison with actual residents above that avenue.

Under our law, touching the powers of the city of New Orleans, as expounded in jurisprudence, it clearly appears, and it is not even disputed, that the city is clothed with the full and exclusive power of granting franchises for the construction, operation and running of· railroads over the streets, as well as the power of fixing·a tariff of rates to be exacted by all such corporations.

Act No. 20 of 1882, which was the city charter then in force, gives· to the Council the power " to authorize the use of the streets for horse and steam railroads and to regulate the same, to require and compel all lines of railway or tramway to use any one street, to run on the same track and turn-table, to compel them to keep conductors on their cars," etc.    Brown vs. Duplessis, 14 Ann. 842; Board of Liquidation vs. New Orleans, 32 Ann. 917; Harrison vs. N. O. Pacific R. R. Co., 34 Ann. 462; Tilton vs. Railroad Co., 35 Ann. 1068; Railroad Company vs. N. O., 39 Ann. 709.

But, conceding all these powers to the city of New Orleans, plaintiff

contests the right of the city to make the discrimination complained of.

That argument suggests the question of the right of the judiciary to interfere with the discretion of the city in dealing with matters which the laws of the State have placed within its exclusive control and management. The question came up in the case of Watson vs. Turnbull, reported in the the 34th Annual, p. 856, in which the Court, after a full review of all previous authorities bearing on the point, said:

"Within the corporate limits, the city of New Orleans, under her charter and under the general law, has the right to control, manage and administer the use of the river banks for the public convenience and utility, to establish wharves and landings, to erect works and provide facilities for the use of vessels and water craft, and to charge a just compensation for the use thereof. Riparian proprietors have no right to appropriate to their exclusive use these banks, and they have no private property in the use thereof, which is public. The discretion of the city authorities in determining what are proper and needed facilities for commerce, and on what part of the river bank, within her limits, they should be established, is manifestly not a subject for judicial control or interference."

The views of that opinion, which are supported by numerous previous adjudications, were re-affirmed in the cases of Pickles vs. McLellan Dry Dock Company, 38 Ann. 412, and Villavaso vs. Barthet, 39 Ann. 247.

Plaintiff's argument that the question must be tested under the general law governing and determining the obligations of common carriers is grounded on the provisions of Article 244 of the Constitution, which reads:

"Railways heretofore constructed, or that may hereafter be constructed, in this State are hereby declared public highways, and railroad companies common carriers."

Without deciding that street railroad companies are not common or public carriers, in the general sense of the term, we feel very certain that they were not within the contemplation of the convention in adopting that article.

As streets of a city are, and have at all times been known to be, public highways, it cannot be supposed that because railroad tracks were laid thereon it required a constitutional declaration to the effect that they were public highways.

But, construing that article in connection with Articles 243, 245 and

46 of the same Constitution, it is manifest that the article was not in-tended to have the slightest reference to street railways, and that as to them the municipal power to regulate, manage and control their construction and operation was not intended to be affected, altered or modified by any provision of the Constitution.

Article 243 recognizes the general power of building railroads in the State and of connecting them with railroads of other States; and regulates the manner of one road intersecting another, and of transporting each the other's passengers, etc., without delay or discrimination.

Article 245 requires all railroad corporations doing business in this State to have and maintain public offices in the State for the transfer of stock and for the transaction of other dealings connected with their stock.

It requires no argument to show that in all these references to rail-road corporations the convention did not intend to include street railroads.

But the intention to leave the subject matter to the municipal authorities, to which they had always been relegated, is removed beyond the domain of discussion by Article 46, which provides :

"The General Assembly shall not pass any local or special law on the following specified objects:   *   *   *   Authorizing the construction of street passenger railroads in any incorporated town or city."   *   *

Now, as no legislation has yet been enacted in furtherance of any of the articles above referred to, so as to subject street railroads to the same rules, it is absolutely safe to conclude that nothing therein con-tained can fairly be construed as impairing the exclusive control of the city of New Orleans over all the street railroads heretofore con-structed or that may hereafter be constructed within her limits, and that such power includes the right of fixing the tariff of fares to be charged for the transportation of passengers.

No one is heard to complain of the act of the city in fixing the max-imum rate which can be charged for fare on all the street railroads, including the defendant, which are now under operation in the city. The complaint would be as fruitless as is that of plaintiff in the present controversy.

It is an undeniable proposition that the authority of the City Council in the premises is as effectual and binding as would be a similar provision emanating from the Legislature itself.

Now, in our examination of the numerous authorities quoted by counsel, and in which unreasonable discriminations made by common

carriers were rebuked and avoided, we find that none of the acts complained of had any direct or indirect legislative authority, but that, on the contrary, they antagonized either the general or common law governing the obligations of common carriers, or some special law applicable to the subject matter.

The regulation which is here charged to be an unreasonable discrimination, far from being violative of a special law, is directly sanctioned by legislative authority. More than that, it is embodied in and forms part of a solemn authentic contract between the city and the defendant company. And the Court is urged to cancel and abrogate a contract which the city had the undisputed power to make, and in a proceeding in which she is not even a party.

According to the contract, the established rate of charges for all persons is ten cents between Canal street and Carrollton each way, the exception being in favor of actual residents above Napoleon avenue.

Hence it follows that if any unreasonable discrimination can be charged to the scheme, it must be attributed to the exception, and not to the general rule ; and, therefore, the judgment rendered could not benefit plaintiff, but would materially injure a class of people which the city intended to protect.

It was unquestionably within the discretionary power of the City Council in regulating the defendant's road to consider that, as the commercial centre of the city, the great majority of churches, schools, banks, courts and other institutions were clustered in the neighborhood of the centre of the city, and almost all below Napoleon avenue, it was simply an act of justice to actual residents above Napoleon avenue in the pursuit of their daily avocations and for other equally necessary purposes to enable them to reach the central portion of the city with the same facilities and at the same cost which were afforded to all other residents of the city.

It is settled in jurisprudence that all discriminations are not unjust, unreasonable or oppressive, and that they are, therefore, not all reprehensible.

In the case of Hays vs. Pennsylvania Co., 12 Federal Reporter, p. 311, cited by plaintiff, it was said : " But what are unjust and unreasonable discriminations ? No rule can be formulated to apply to every case that may arise. It may, however, be said that it is only where the discrimination enures to the undue advantage of one man in consequence of some injustice inflicted on another, that the law intervenes

for the protection of the latter. Harmless discrimination may be indulged in."

A similar distinction is made in another case cited by plaintiff, wherein the Court said: " The common and equal right is to reasonable service for a reasonable compensation. Neither the service nor the price is necessarily unreasonable, because it is unequal. The question is not merely whether the service or price is absolutely unequal, in the narrowest sense, but also whether the inequality is unreasonable and injurious." * * * " This question may be made unnecessarily difficult by an indefiniteness, confusion and obscurity of ideas that may arise when the public duty of a common carrier and the correlative common right to his reasonable service for a reasonable price are not clearly and broadly distinguished from a matter of private charity. If A receives, as a charity, transportation service without price, or for less than a reasonable price, from B, who is a common carrier, A does not receive it as his enjoyment of the common right ; B does not give it as a performance of his public duty ; C, who is required to pay a reasonable price for a reasonable service, is not injured, and the public, supplied with reasonable facilities and accommodations on reasonable terms, cannot complain that B is violating his public duty. There is in such a case no discrimination, reasonable or unreasonable, in that reasonable service for a reasonable price [is given], which is the common right." McDuffee vs. Railroad, 52 451, 452. See also 47 Pa. St. 340 ; Shipper vs. Pa. R. R. Co., Railway and Corporation Law Journal, Vol. 1, No. 15, p. 339 ; Schwarz et al. vs. Baltimore Gas Light Company, Wood's Railway Law, p. 565, Sec. 197.

So in this case, if we subject the act of the city to the test of the general law on the subject of discriminations, as though she herself owned and operated the road, we find that plaintiff and all other persons have a reasonable service at an avowedly reasonable price, and that the difference made in favor of actual residents above Napoleon avenue is simply an act of liberality, resting on a sense of justice and fair play, to a class of people who are all treated alike in the matter of that service, and who would, in default of that exception, be placed at a great disadvantage from all other residents of the city. Hence, we conclude that under those circumstances the public cannot complain, and that plaintiff's action cannot be maintained.

Judgment affirmed.